## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Raytheon Aircraft Company,**

     **Plaintiff,**

v.                                    **Case No. 05-2328-JWL**

**United States of America,**

     **Defendant.**

### MEMORANDUM AND ORDER

Plaintiff Raytheon Aircraft Company filed suit against the United States of America under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) asserting in Count V of its complaint that CERCLA's section 106 remedial scheme violates due process, both as written and as applied. This matter is now before the court on defendant's motion to dismiss or, in the alternative, for summary judgment on Count V of Raytheon's complaint. As will be explained, the motion is granted.[1]

### I.    Factual Background

The facts presented here are taken from Raytheon's complaint and, for purposes of the

---

[1] The Washington Legal Foundation and Kansas Grain and Feed Association have filed an amici curiae brief in opposition to defendant's motion. Although the court has carefully considered the arguments raised in that brief, the court does not separately address those arguments that mirror the arguments asserted by Raytheon. The court, however, does separately address those arguments presented by amici that have not been asserted by Raytheon.

United States' motion, the court accepts these facts as true.[2]  From 1942 through 1946, the United States Army constructed and the Army Air Corps operated the Herington Army Airfield (HAAF).  During this time period, the Army Air Corps processed bombing crews and aircraft as part of the World War II war effort.  The Army Air Corps also performed maintenance on B-29 aircraft, including engine repair, engine replacement, spark plug degreasing, hydraulic repair and repainting.  In conducting such maintenance, the Army Air Corps utilized volatile organic compounds and chlorinated degreasing solvents, including trichloroethylene (TCE).  The Army Air Corps' civilian and military employees spilled, poured and released these solvents, including TCE, onto the ground at HAAF and into drains that discharged directly to the environment.

In 1948, the United States quitclaimed HAAF to the City of Herington, Kansas; thereafter, the City of Herington renamed the site the Tri-County Public Airport ("TCPA") and leased portions of it to commercial tenants, including Beech Aircraft Company ("Beech"), the predecessor to Raytheon Aircraft Company ("Raytheon").  Beginning in 1950, Beech leased parts of the site from the City and, until 1960, used portions of its leasehold as a military aircraft refurbishing facility and for various manufacturing purposes, including the production of wing fuel dispersing tanks and military aircraft starter generators.

Between 1993 and 1997, the Environmental Protection Agency (EPA) conducted

---

[2]The United States' motion is presented as a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment.  In support of its motion, however, the United States does not reference any material outside Raytheon's complaint.  Thus, the court analyzes the United States' motion through the lens of Federal Rule of Civil Procedure 12(b)(6).

investigations at TCPA to determine whether the Army Air Corps' activities during World War II had caused soil or groundwater contamination.   The EPA detected TCE and other contaminants at TCPA.  In October 1997, the EPA tested private groundwater wells in the area around TCPA and detected TCE in some of the groundwater samples.  That same month, the EPA contacted Raytheon about contamination at the site and Raytheon's possible status as a potentially responsible person ("PRP").   In 1998, the EPA began an expanded site investigation/remedial investigation at TCPA to clarify that the release of TCE had occurred and to determine the extent of contamination.  In response to a request for information issued by the EPA to the United States Army Corps of Engineers, the Army Corps of Engineers summarily denied that it had polluted TCPA and apparently denied using TCE at the site.

In September 2004, the EPA, pursuant to CERCLA section 106, issued a unilateral administrative order (UAO) to Raytheon and the City of Herington, in which it identified Raytheon as a PRP and directed Raytheon to excavate and properly dispose of TCE-contaminated soils from an insular location at TCPA where, according to Raytheon, the Army Corps of Engineers operated a TCE-vapor degreaser.  Raytheon alleges that the work required by the UAO involves a separate and distinct area of the site from the area where Beech had its wing tank manufacturing operation (an operation that, as conceded by Raytheon, utilized a TCE-degreaser).  Nonetheless, Raytheon agreed to perform the work required in the UAO and, in doing so, expended nearly $2.5 million.  In September 2006, the EPA issued a notice of completion informing Raytheon that all work at the Site had been fully performed in accordance with the UAO.

## II.    Pertinent Statutory Framework

CERCLA is "best known as setting forth a comprehensive mechanism to cleanup hazardous waste sites under a restoration-based approach." *New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1244 (10th Cir. 2006) (citing *United States v. Bestfoods*, 524 U.S. 51, 55 (1998)). CERCLA's principal aims "are to effectuate the cleanup of hazardous waste sites and impose cleanup costs on responsible parties." *Id.* (citing *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996)). The EPA has the authority under CERCLA to effectuate hazardous waste cleanup in two primary ways–it can take responsive action itself and then seek reimbursement from responsible parties, *see* 42 U.S.C. § 9607(a)(4)(A), or it can compel responsible parties to perform the cleanup. *See id.* § 9606(a); *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 161 (2004).

In compelling responsible parties to perform the cleanup, the EPA issues an administrative order under section 106 of CERCLA setting out the required remedial action. The EPA can enforce its order by filing suit in federal district court and in that suit the EPA can also seek civil penalties up to $25,000 for each day the violation or non-compliance continues, 42 U.S.C. § 9606(b), and punitive damages up to three times "the amount of any costs incurred" by the Superfund as a result of the party's non-compliance. *Id.* § 9607(c)(3). No penalties can be imposed and no punitive damages can be awarded, however, if the district court determines that the recipient had "sufficient cause" for not complying with the order. *Id.* §§ 9606(b), 9607(c)(3). Morever, even if the district court determines that the recipient did not have sufficient cause, the district court retains the discretion to determine whether noncompliance

4

warrants the imposition of penalties or punitive damages and, if so, the amount of such penalties or damages. *See id.*

In turn, the recipient of an administrative order has at least two options upon receiving the order if it does not believe that it is responsible for the cleanup. First, it can decline to comply with the order and wait for the EPA to file an enforcement suit. Second, the recipient can comply with the order and then petition the EPA for reimbursement of its costs plus interest. *Id.* § 9606(b)(2)(A). If the petition is denied, the party may file suit in federal district court and will prevail only upon a showing that it is not liable for response costs under section 107(a) or, if the party is liable, upon a showing that the required response action was arbitrary and capricious. *See id.* § 9606(b)(2)(B)-(D).

## III.   Standard

The court will dismiss a cause of action for failure to state a claim only when the factual allegations fail to "state a claim to relief that is plausible on its face,"*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), or when an issue of law is dispositive. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The complaint need not contain detailed factual allegations, but a plaintiff's obligation to provide the grounds of entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do. *Bell Atlantic*, 127 S. Ct. at 1964-65. The court must accept the facts alleged in the complaint as true, even if doubtful in fact, *id.* at 1965, and view all reasonable inferences from those facts in favor of the plaintiff, *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006). Viewed as such, the

"[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic*, 127 S. Ct. at 1965 (citations omitted). The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## IV.  Discussion

In Count V of its complaint, Raytheon asserts that CERCLA's section 106 remedial scheme–both as written and as applied in this particular case–violates Raytheon's procedural due process rights guaranteed by the Fifth Amendment.[3] Raytheon articulates three theories in support of its claim–that the section 106 remedial scheme deprives Raytheon of various protected interests without due process of law; that the statutory scheme violates due process under *Ex Parte Young*, 209 U.S. 123 (1908), because the penalties imposed for challenging a

---

[3]The parties dispute the nature of the constitutional challenge asserted by Raytheon in Count V. The United States urges that Raytheon makes only facial arguments concerning the CERCLA statute itself and Raytheon contends that it is challenging the statute as applied to Raytheon. After carefully analyzing the complaint and the arguments presented by Raytheon and amici, the court concludes that Raytheon is actually asserting both types of challenges. To be sure, many of Raytheon's arguments are "textual" arguments attacking the section 106 remedial scheme itself. To the extent, however, that Raytheon challenges the EPA's decision in this case, where the United States is also a PRP at the Site, to issue a section 106 administrative order only to Raytheon, that challenge constitutes an "as applied" challenge. *See United States v. Pruitt*, 487 F.3d 1298, 1315 (10th Cir. 2007) (facial challenge to legislation asserts that statute violates the Constitution on all, or virtually all, of its applications; as-applied challenge concedes that the statute may be constitutional in many of its applications, but contends that it is not so under the particular circumstances of the case) (McConnell, J., concurring).

section 106 administrative order are so coercive that they deprived Raytheon of any meaningful opportunity to challenge that order in court; and that the United States' "dual role" in this case as both the enforcer of CERCLA and a potentially responsible party at the Site violates due process because the United States, by issuing a section 106 administrative order only to Raytheon, has ignored its own liability and has shifted that liability to Raytheon.

A.      *Deprivation of Protected Interests*

Raytheon asserts that the EPA's issuance of the UAO deprived Raytheon of its property interests by requiring Raytheon to perform work that ultimately cost Raytheon nearly $2.5 million and/or by imposing on Raytheon a legal obligation (where none existed before the issuance of the UAO) to perform specific actions. In addition, amici contend that the issuance of the UAO deprives Raytheon of a liberty interest. As will be explained, the court rejects each of these arguments.

1.      Property

Raytheon concedes, as it must, that nearly every court that has addressed a facial challenge to section 106 has held that the issuance of a UAO does not trigger a property deprivation on the grounds that the EPA can only force compliance after judicial intervention and, until that time, there has been no deprivation. *See, e.g., United States v. Capital Tax Corp*., 2007 WL 488084, at *3 (N.D. Ill. Feb. 8, 2007) ("While the court agrees that the issuance of the UAO occurs without a prior hearing, the statutory scheme is set up so that no deprivation occurs

until after a judicial hearing."); *General Elec. Co. v. Johnson*, 362 F. Supp. 2d 327, 339 (D.D.C. 2005) ("Under the statutory language and structure, EPA does not through the mere issuance of a UAO under section 106 deprive a PRP of a significant property interest without judicial intervention."); *Employers Ins. of Wausau v. Browner*, 848 F. Supp. 1369, 1374 (N.D. Ill. 1994) (A PRP "is fully entitled to obtain judicial review of the EPA's order prior to being deprived of its property."); *see also Wagner Elec. Corp. v. Thomas*, 612 F. Supp. 736, 742 (D. Kan. 1985) ("Indeed, plaintiffs can suffer no detriment unless and until EPA files an action against them in federal court.").  As explained by the court in *Capital Tax*,

> The UAO is not self-enforcing, and the EPA lacks the power to enforce a UAO. Rather, in order to enforce the cleanup outlined in the UAO, the EPA must file suit in district court.  It is that lawsuit that provides the potentially responsible party with due process of law, and that due process occurs before any deprivation.

2007 WL 488084 *3.  Raytheon contends that the facts here are distinguishable because Raytheon, unlike the PRPs in the cases cited above, complied with the UAO and expended significant sums of money in connection with that compliance.  The fact that Raytheon elected not to exercise its right to a pre-deprivation judicial hearing by complying with the UAO does not render the statutory scheme unconstitutional–indeed, the ability of Raytheon to choose whether to comply with the UAO is the key and, if it chooses not to comply, it is fully entitled to a judicial hearing prior to the deprivation of any property.  *General Elec. Co.*, 362 F. Supp. 2d at 339.

Raytheon, however, contends that the UAO need not be self-executing to constitute a deprivation because the issuance of it imposes a binding, legal obligation upon the recipient

regardless of the PRP's response.[4]  This argument is based on *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981).[5]  In *Hodel*, an administrative order issued by the Secretary of Interior requiring the immediate cessation of mining operations was found to fall under the "emergency situation exception to the normal rule that due process requires a hearing prior to deprivation of a property right." *Id*. at 300.  According to Raytheon, then, the Supreme Court in *Hodel*, by applying an exception to the rule requiring a pre-deprivation hearing,

_____

[4]Raytheon urges that the issuance of the UAO, in addition to imposing a legal obligation on Raytheon, altered Raytheon's legal status by creating a presumption that Raytheon is liable for the cleanup and by shifting the burden of proof to Raytheon to establish that it was not liable.  The court rejects this argument.  The burden of proof did not shift to Raytheon upon issuance of the UAO nor did the UAO, standing alone, create a presumption of Raytheon's liability.  The burden of proof shifted only upon Raytheon's decision to comply with the UAO and to pursue reimbursement.  For had Raytheon elected not to comply, then EPA would have been required to enforce the order in federal court where EPA would have had the burden to prove Raytheon's liability.  *See Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 661, 664 (7th Cir. 1995) (defendant has the opportunity in enforcement proceeding to "put the EPA to its proof" that defendant is liable party); *General Elec. Co. v. Johnson*, 362 F. Supp. 2d 327, 341 (D.D.C. 2005) ("EPA is required under CERCLA to prove de novo in a federal court that the PRP is in fact the liable party.").

[5]In a related argument, amici contend that the legal obligation imposed by the issuance of a UAO effects a deprivation of property in a manner akin to CERCLA's lien provision found unconstitutional by the First Circuit in *Reardon v. United States*, 947 F.2d 1509 (1st Cir. 1991).  In *General Electric Co.*, the district court rejected this argument and, for the same sound reasons, the court does so here.  As explained by the district court in General Electric, "the enforcement mechanisms in section 106 are quite different than the CERCLA lien provisions ruled unconstitutional" in *Reardon*. 362 F. Supp. 2d at 339.  Under the lien provisions, the EPA can file a lien on real property without any prior hearing and, because a lien significantly encumbers real property, it amounts to a deprivation of property.  *Id*.  In contrast, the issuance of a section 106 order "does not have that same tangible impact on a PRP or its property" as there "is no immediate significant impact on a property interest, and no penalties need be paid at that time."  *Id*.  Thus, *Reardon*, with "its limited focus on the unique consequences of a lien on real property," *id*., does not support amici's argument.

recognized that an administrative order requiring a recipient to perform actions generally implicates due process concerns.  Defendant, in turn, contends that Raytheon's reliance on *Hodel* is misplaced as the Supreme Court never considered whether the order issued in that case constituted a deprivation of property and did not address the issue of when a deprivation occurs.

Two district courts have considered this very argument under *Hodel*, the D.C. district court in *General Electric Co. v. Johnson* and the Eastern District of Michigan in *Pactiv Corp. v. Chester*, 455 F. Supp. 2d 680 (E.D. Mich. 2006) ("*Pactiv II*").  In *General Electric Co.*, the district court  rejected GE's argument that the issuance of a section 106 administrative order constituted a deprivation of property under *Hodel*.  Finding that argument "unavailing," the district court stated:

> The Supreme Court never actually considered in *Hodel* whether the order of the Secretary of the Interior halting mining operations amounted to a deprivation of property.  Moreover, the order challenged in *Hodel* affirmatively required an *immediate* cessation of mining operations.  *See* 452 U.S. at 300.  There is no similar deprivation when EPA issues an order under section 106, since compliance will generally entail a drawn out undertaking, which may not even commence in concrete terms for months.  In that setting, a PRP does not suffer a significant deprivation of property simply upon the issuance of a section 106 order.

362 F. Supp. 2d at 340 (emphasis added).  In contrast, the district court in *Pactiv II*, examining the constitutionality of a Michigan statute mirroring CERCLA, concluded that the Supreme Court in *Hodel* did consider the question of whether a property interest was at stake and found such an interest.  455 F. Supp. 2d at 688.  Analyzing the district court's decision in *General Electric Co.*, the *Pactiv II* court stated:

> The D.C. Court's more convincing argument for distinguishing *Hodel* deals with the immediacy of the order, implying that instructions to undertake actions that

> may take months raise less need for immediate review than those that must be
> completed in a day.  Unfortunately, the D.C. Court offered no precedential support
> for this legal principle.

*Id.* (citation omitted).  Ultimately, the court in *Pactiv II* denied the defendant's motion under a

Rule 12(b)(6) standard, concluding that it "cannot say at this time [plaintiff] could prove no facts

that would allow it to show an interest under the *Hodel* standard."  *Id*.

      This court's own reading of *Hodel*, however, is simply not as broad as Raytheon's reading

of the case.  Significantly, a party served with an immediate cessation order under the statute at

issue in *Hodel* is required to comply with the order by ceasing that portion of its operations that

is the subject of the order and a party who fails to comply is subject to mandatory civil penalties.

*See* 30 U.S.C. § 1268(a); *Save Our Cumberland Mountains, Inc. v. Lujan*, 963 F.2d 1541, 1544

(D.C. Cir. 1992) (once a cessation order issues, civil penalties must be assessed against the

mine).

While a party served with a cessation order may seek review of the order, the filing of an

application for review does not stay the cessation order.  30 U.S.C. § 1275(a)(1).  Moreover, a

party seeking to contest the order itself or the amount of the penalty is required to pre-pay the

penalty to an escrow account prior to review.  30 U.S.C. § 1268(c).  Because a party is required

to either cease operations or pay civil penalties prior to the review process itself, that party

necessarily incurs losses prior to receiving a hearing.  *See Hodel*, 452 U.S. at  299 (noting that

by the time the cessation orders at issue were overturned on appeal, the company involved had

suffered significant losses).  Thus, the cessation order examined by the Court in *Hodel* is totally

unlike the section 106 administrative order issued to Raytheon under CERCLA.  *Hodel*, then,

does not support Raytheon's argument that the issuance of a section 106 administrative order implicates due process concerns.


2.      Liberty

Amici argue that the mere issuance of a UAO also deprives the recipient of a liberty interest because the UAO represents "an administrative determination of a party's responsibility for a particular response action" and thus constitutes the type of "governmental stigmatization" that courts have recognized as an abridgment of a party's constitutionally protected liberty.  The court cannot agree.  The Supreme Court "teaches that this sort of an allegation of defamation is actionable only when made in the context of a denial of or discharge from a government contract."  *Asbestec Const. Servs., Inc., v. U.S. E.P.A.*, 849 F.2d 765, 769-70 (2d Cir. 1988) (citing *Paul v. Davis*, 424 U.S. 693, 706 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 573-74 (1972) (liberty interest implicated if there is a discharge and stigma or deprivation of future opportunity for government employment)).  Indeed, each of the cases relied upon by amici involve the loss of government employment or the denial of a government contract.  *See, e.g.*, *Transco Security, Inc. v. Freeman*, 639 F.2d 318 (6th Cir. 1981); *Old Dominion Dairy v. Department of Defense*, 631 F.2d 953 (D.C. Cir. 1980).  Raytheon does not allege that the EPA's issuance of the UAO affected in any way its opportunities to obtain government contracts.  Consequently, the issuance of the UAO did not result in a deprivation of Raytheon's liberty interest.

B.      *Ex Parte Young*

Raytheon next contends that defendant's issuance of the UAO deprived Raytheon of a constitutionally protected interest under *Ex Parte Young*, 209 U.S. 123 (1908), because the penalties imposed for challenging the UAO are so coercive that they deprived Raytheon of any meaningful opportunity to challenge the UAO in court. *Ex Parte Young* establishes that a statutory scheme violates due process if "the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation." *Id.* at 147. The constitutional requirements of *Ex Parte Young* are met, however, if the "challenged statutory scheme may be interpreted so that no penalty is imposed if the challenging party has reasonable grounds to contest the validity or applicability of an administrative order." *Solid State Circuits, Inc. v. U.S.E.P.A.*, 812 F.2d 383, 390 (8th Cir. 1987); *accord Wagner Seed Co. v. Daggett*, 800 F.2d 310, 315 (2d Cir. 1986) ("The constitutional requirement is satisfied by a statutory scheme which provides an opportunity for testing the validity of statutes or administrative orders without incurring the prospect of debilitating or confiscatory penalties."). Thus, "it is plain that there is no constitutional violation if the imposition of penalties is subject to judicial discretion and the enforcement provisions contain a good faith exception." *Wagner Seed*, 800 F.2d at 316.

Significantly, the pertinent provisions of CERCLA concerning penalties faced by a PRP who elects not to comply with a section 106 order provide that the imposition of such penalties is subject to judicial discretion and that such penalties are disallowed where the potentially responsible party had "sufficient cause" not to comply with the order. Those provisions state

13

as follows:

> Any person who, *without sufficient cause*, willfully violates, or fails or refuses to comply with, any order of the President under subsection (a) of this section *may*, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $25,000 for each day in which such violation occurs or such failure to comply continues.

42 U.S.C. § 9606(b)(1) (emphasis added).

> If any person who is liable for a release or threat of release of a hazardous substance fails *without sufficient cause* to properly provide removal or remedial action upon order of the President pursuant to section 9604 or 9606 of this title, such person *may* be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action.

42 U.S.C. § 9607(c)(3) (emphasis added).

The Eighth Circuit has construed the "sufficient cause" phrase to constitute the requisite "good faith" defense, *see Solid State Circuits*, 812 F.2d at 390-91, and both the Eighth Circuit and Seventh Circuit have recognized that this defense cures any potential constitutional deficiency under *Ex Parte Young*. *See id.* at 391 ; *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 664 (7th Cir. 1995) ("If a party ordered to clean up doesn't want to spend any money, it can refuse to obey the order, wait to be sued, and use that suit as the vehicle for obtaining a determination of its liability. The risk of losing and being made to pay heavy sanctions, a risk mitigated by the defense of sufficient cause as glossed in *Solid State Circuits*, would not violate the Constitution . . . ."). The Second Circuit, in turn, has held that the good faith defense in combination with the availability of judicial discretion satisfies the constitutional requirements of *Ex Parte Young*. *See Wagner Seed*, 800 F.2d at 316 (rejecting *Ex Parte Young* due process challenge to UAO

14

framework). Moreover, nearly every District Court to have addressed the issue has held, consistent with the Circuit Courts of Appeals, that the remedial scheme set forth by section 106 of CERCLA does not implicate *Ex Parte Young* concerns. *See, e.g., United States v. Capital Tax Corp.*, 2007 WL 488084, at *4-5 (N.D. Ill. Feb. 8, 2007) (sufficient cause defense coupled with judge's discretion not to order penalties "avoids the *Ex Parte Young* problem and renders the provisions constitutional"); *General Elec. Co. v. Johnson*, 362 F. Supp. 2d 327, 342-43 (D.D.C. 2005) (sufficient cause defense cures any possible *Ex Parte Young* problem); *Employers Ins. of Wausau v. Browner*, 848 F. Supp. 1369, 1374-75 (N.D. Ill. 1994) (penalty provision does not affect constitutionality of section 106 remedial scheme in light of good faith defense and judicial discretion); *Wagner Elec. Corp. v. Thomas*, 612 F. Supp. 736, 742-45 (D. Kan. 1985) (same).

The court is persuaded by the well-reasoned conclusions of these courts and Raytheon offers no convincing argument for the court to hold otherwise. Raytheon again directs the court to *Pactiv II*, this time for that court's analysis of an *Ex Parte Young* challenge to the Michigan statute. Denying the defendants' motion to dismiss in light of plaintiff's request for discovery to challenge the motion, the district court in *Pactiv II* expressed concern that the Michigan statutory scheme potentially implicated *Ex Parte Young* both because a PRP facing a UAO did not have an "immediate prospect" of a judicial hearing and because the severity of potential penalties faced by the particular PRP in that case could be "ruinous." 455 F. Supp. 2d at 692-93. These concerns, however, are not pertinent to the *Ex Parte Young* facial challenge lodged by

Raytheon in this case.  Regardless of the timing of the EPA's enforcement action,[6] "whether it is a one day penalty or a one thousand day penalty, the challenging party can still avoid it by showing it had 'sufficient cause' to refuse compliance" and also has the opportunity to convince a judge to exercise discretion by not imposing fines in any event.  These safeguards provide the necessary constitutional protection.  *See General Elec. Co.*, 362 F. Supp. 2d at 343 (neither timing issue nor severity of potential penalty condemns section 106 UAO scheme under the Fifth Amendment based on GE's textual challenge to CERCLA).

Raytheon also complains that the "sufficient cause" defense was not available to it because it elected to comply with the UAO and urges that this fact sets this case apart from the litany of cases finding that section 106 satisfies the constitutional requirements of *Ex Parte Young*.[7]  But the consequences of Raytheon's decision to comply are not pertinent to the *Ex Parte Young* analysis –the key is whether the penalties risked by a *refusal to comply* with the UAO are so severe that the statutory scheme amounts to a denial of judicial review.  *See*

_____

[6]In any event, Raytheon's complaint contains no allegations concerning the timing of enforcement actions under section 106.

[7]Amici also contend that the "sufficient cause" defense fails to provide a constitutionally adequate hearing because there is never "a hearing at which the agency bears the burden of persuading an impartial decisionmaker that the UAO was properly issued under applicable law."  To the contrary, while the UAO recipient can invoke the "sufficient cause" defense to civil penalties and punitive damages in an enforcement action, the EPA nonetheless retains the burden to prove that CERCLA required the recipient to clean up the site.  *See Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 661, 664 (7th Cir. 1995) (defendant has the opportunity in enforcement proceeding to "put the EPA to its proof" that defendant is liable party); *General Elec. Co. v. Johnson*, 362 F. Supp. 2d 327, 341 (D.D.C. 2005) ("EPA is required under CERCLA to prove de novo in a federal court that the PRP is in fact the liable party.").

*Reisman v. Caplin*, 375 U.S. 440, 446 (1964).  Stated another way, the question is whether Raytheon's choice to comply was, in fact, a choice or whether it was essentially forced to comply because noncompliance carried the risk of penalties so severe as to preclude Raytheon's ability to test the validity of the order.  As explained above, Raytheon was not denied the opportunity for judicial review of the order in light of the "sufficient cause" and judicial discretion aspects of section 106.  Thus, while Raytheon in this case chose to comply with the UAO, the choice between complying with the order or facing potential penalties is not an unconstitutional one.

For their part, amici urge that the "sufficient cause" defense is constitutionally inadequate because the potential penalties are "astronomical" and because the concept of "sufficient cause" is too amorphous to provide reliable protection.  Even assuming, however, that the "sufficient cause" defense were insufficient to cure potential *Ex Parte Young* problems, "the additional if imperfect remedy" granted by the reimbursement provision of section 106 is sufficient to do so.  As the Seventh Circuit has explained, "[t]he provision for reimbursement trims the horns" of the "dilemma" faced by a UAP recipient by "offering a party served with a clean-up order a third way."  That party "can obey and then when it has completed the clean-up required by the order sue for the return of its expenses on the ground that it was not a responsible party within the meaning of the statute."  *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 661-62 (7th Cir. 1995).[8]

_____

[8]Moreover, in this case, Raytheon also maintains a right of contribution from other sources of the contamination and, possibly, a claim for cost recovery in light of *Atlantic*

Amici complain that the reimbursement proceeding does not cure *Ex Parte Young* problems because the "arbitrary and capricious" standard applicable in a reimbursement proceeding is too deferential to provide any protection and notes, without citation to any evidence, that "only a handful of petitions for reimbursement have ever been granted." But the arbitrary and capricious standard applies only if Raytheon is liable for the cleanup in any event. *See* 42 U.S.C. § 9606(b)(2)(B)-(D). To the extent a UAO recipient is asked to incur costs *not* as a responsible party (for example, when one polluter is required to clean up his own pollution as well as the pollution of other parties at the same site for efficiency reasons), he "can certainly get reimbursement." *Employers Ins. of Wausau*, 52 F.3d at 665. Amici also contend that the reimbursement provision is an inadequate alternative because a UAO recipient who complies and cleans up a site cannot petition for reimbursement until the EPA certifies that the cleanup is complete; in some cases, cleanup may take "a decade or more," pushing the opportunity for reimbursement too far into the future. But the delay of a party's right to reimbursement until the completion of cleanup activities does not render the reimbursement provision a constitutionally inadequate alternative; it is simply another factor for a UAO recipient to consider in deciding whether to comply with the UAO. *See id.* at 664 ("If a party ordered to clean up doesn't want to spend any money, it can refuse to obey the order . . . . The energy that Employers Insurance devoted in its briefs to attempting to create constitutional qualms about the remedial structure of the Superfund law was misdirected."); *see also Capital Tax*, 2007 WL 488084, at *3 ("The

---

*Research.*

18

mere delay of the due process does not mean that due process was lacking.").

In connection with its as-applied challenge, Raytheon asserts that the EPA treated the United States Army Corps of Engineers more favorably than it treated Raytheon (essentially, by issuing the UAO to Raytheon and purportedly ignoring the Corps' liability and shifting the Corps' liability to Raytheon) and urges that the United States' dual role as both a PRP at the Site and the enforcer of CERCLA "distinguishes this case from all prior cases upholding CERCLA section 106 under *Ex Parte Young*." Raytheon, however, fails to explain how these facts affect the *Ex Parte Young* analysis and the court discerns no meaningful distinction between Raytheon's situation and the PRPs in those cases rejecting arguments based on *Ex Parte Young*. Even assuming that the United States is itself a PRP and that the United States received favorable treatment by the EPA to Raytheon's detriment, Raytheon, had it elected not to comply with the UAO, would nonetheless have been entitled to a "sufficient cause" defense as well as the availability of judicial discretion prior to the imposition of penalties. In other words, the United States' status as a PRP in no way affects the application of the penalty provisions of section 106 and does not affect Raytheon's opportunity to challenge the validity of the order in a judicial forum.

For the foregoing reasons, the court rejects Raytheon's *Ex Parte Young* facial and as-applied challenges to CERCLA's section 106 remedial scheme.[9]

---

[9]Amici contend that the risk of substantial penalties faced by a non-complying UAO recipient violates the doctrine of unconstitutional conditions. This argument mirrors the *Ex Parte Young* argument presented by the parties and, for the same reasons, the court rejects it. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 218 (1994) (rejecting in tandem *Ex*

C.      *The Government's Role as a PRP*

Both Raytheon and amici contend that, even putting aside the extent to which the government's dual role as the enforcer of CERCLA and a PRP at the Site factors into the specific arguments raised above, that dual role violates Raytheon's due process rights because the government has shifted its own liability to Raytheon and has violated the very provisions of CERCLA itself by issuing a UAO to Raytheon while ignoring the government's own liability. As explained below, however, the facts alleged by Raytheon are insufficient to state a claim that Raytheon was denied procedural due process.

1.      Shifting of Liability

Raytheon contends that the issuance of the UAO to Raytheon forced it to spend money to "extinguish" the United States' own liability and that this "shifting of liability" violates the Due Process Clause.[10]  In support of its argument, Raytheon relies on *Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed. Cir. 1996), a case involving an illegal exaction claim asserted under the Tucker Act "for recovery of monies that the government has required to be paid contrary to law." *Aerolineas Argentinas*, 77 F.3d at 1572.  In *Aerolineas*, the Immigration and

_____

*Parte Young* and unconstitutional conditions arguments where civil penalty scheme provided that penalties were final and payable only after full review).

[10]Amici argue that the government's "self-dealing" in this case is a violation of due process.  The substance of that argument, however, mirrors Raytheon's argument concerning the government's shifting of its own liability to Raytheon.  The court, then, does not separately address amici's argument.

Naturalization Service (INS) refused to bear the costs of detaining illegal aliens who had arrived in the United States on the plaintiff's commercial flights as required by statute and instead required the plaintiff to bear these costs. *Id.* at 1568. The Federal Circuit held that because the INS compelled the airlines to bear costs that the government had a legal duty to bear, the plaintiffs had alleged facts to state a claim for an illegal exaction of money by the government. *Id.* at 1574. Specifically, the court held that if the airlines "made payments that by law the [INS] was obliged to make, the government has 'in its pocket' money corresponding to the payments that were the government's statutory obligation. Suit can be maintained under the Tucker Act for recovery of the money illegally required to be paid on behalf of the government." *Id.* at 1573-74.

The factual context of *Aerolineas*, of course, is markedly different than the facts presented here. In *Aerolineas*, the government was required by statute to pay the costs of detaining aliens pending asylum procedures and that statute was enacted specifically to relieve the airlines of the custodial role for excludable aliens seeking political asylum. *Id.* at 1571. Nonetheless, the INS disregarded the express statutory language and persisted in requiring the airlines to pay detention and maintenance costs. *See id.* The Federal Circuit readily concluded that the INS's practice constituted an "illegal exaction of moneys to meet an obligation of the government." *Id.* at 1578. The facts alleged by Raytheon, however, fail to state a claim for relief under its "illegal exaction" or "shifting of liability" theory. Nothing in the CERCLA framework relieves private party PRPs from liability when a federal agency is also a PRP. Unlike the commercial airlines in *Aerolineas*, then, Raytheon is still potentially liable for at least some portion of the costs

incurred in cleaning up the Site.  Moreover, under the CERCLA scheme, there is nothing "illegal" about directing Raytheon–undisputedly a PRP–to bear the costs of the cleanup and then permitting Raytheon to seek reimbursement for those costs for which it is not responsible costs. Finally, it is undisputed that the EPA is not required to issue a section 106 order to each and every PRP.  Under these facts, Raytheon cannot show that it was required to make payments that "by law" the government was required to make.[11]

2.    Statutory Violation

Finally, Raytheon contends that the EPA's issuance of the UAO in this case violates CERCLA section 120(a)(1) and that this statutory violation, in turn, violates Raytheon's due process rights because it deprives Raytheon of the protections set forth in CERCLA itself. Section 120(a)(1) provides that "[e]ach department, agency, and instrumentality of the United States  shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity."  According to Raytheon, the EPA violated section 120(a)(1) by issuing a UAO to Raytheon but not to the United States despite ample evidence of the United States' own liability at the Site.  More succinctly, Raytheon contends that section 120(a)(1) "establishes a right to equal treatment where a private party and the United States are PRPs at the same facility."

---

[11]To the extent Raytheon argues that the government has "extinguished" its own liability by issuing the UAO to Raytheon, that argument also lacks merit in the context of this case because the court has held that Raytheon may pursue a contribution claim against the United States in its role as PRP.

The court rejects this argument for two reasons.  First, the sole constitutional challenge asserted by Raytheon in its complaint is a due process challenge; in contrast, the arguments set forth by Raytheon in its briefing concerning section 120(a)(1) clearly set forth an equal protection challenge.  *See Christian Heritage Academy v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1031 (10th Cir. 2007) (government violates the Equal Protection clause when it "treats someone differently than another who is similarly situated" without a rational basis for the disparate treatment).  The court construes Raytheon's allegations as a request to amend its complaint, *see Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003) (inclusion of new allegations in a response to a motion for summary judgment should be considered a request to amend the complaint pursuant to Federal Rule of Civil Procedure 15), and denies the request at this late stage of the litigation.  Second, Raytheon's claim fails in any event because section 120(a)(1) is simply a waiver of sovereign immunity, *see Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 10 (1989) (section 120(a)(1) is "doubtless an unequivocal expression of the Federal Government's waiver of its own sovereign immunity), *overruled on other grounds by Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), and does not create any substantive rights.  *See In re Franklin Savings Corp.*, 385 F.3d 1279, 1286 (10th Cir. 2004) (section of Bankruptcy Code governing waiver of sovereign immunity "does not provide a substantive or independent basis for asserting a claim against the government" and a plaintiff must demonstrate that a source outside the waiver provision entitled it to relief).  Raytheon's due process claim, then, is dismissed to the extent it is based on purported statutory violations.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion to dismiss or, in the alternative, for summary judgment on Count V (doc. 156) is granted.

**IT IS SO ORDERED.**

Dated this 10th day of August, 2007, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge