**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY**

RAYTHEON AIRCRAFT COMPANY    )
    )
                  Plaintiff    )
    )
                      v.    )     Case No. 05-2328 JWL
    )
UNITED STATES OF AMERICA    )
    )
            Defendant    )
    )

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION
TO COMPEL PRODUCTION OF REPORTS RELATED TO THE
GOVERNMENT'S HISTORICAL USE OF CHLORINATED SOLVENTS**

In support of its corresponding Motion to Compel Production of Reports Related to the Government's Historical Use of Chlorinated Solvents, Raytheon states as follows:

**THE NATURE OF THE MATTER BEFORE THE COURT**

Pursuant to Federal Rules of Civil Procedure 26(b)(3) and 37, Plaintiff Raytheon Aircraft Company ("Raytheon") respectfully requests that the Court issue an order compelling Defendant United States to produce four reports related to the Government's historical use of chlorinated solvents. One report, entitled "Historical Use and Development of Chlorinated Solvents," (hereinafter, "Historical Use report") was written in 1996. The second report, written in 1998, is entitled, "Solvents in Army Airfield Maintenance Operations – World War II" (hereinafter, ""WWII Airfield Solvents report"). The third report is called the "Task 8" report (hereinafter "Task 8 report") and discusses the procedures and manuals concerning the use of chemicals at Army and Navy Airfields from World War II to the 1960s. The fourth report is a "summary report" (hereinafter "Summary report") outlining the information contained in the other reports

requested.[1]  Raytheon also requests any underlying document not previously produced that was used to create the four reports listed above.  The United States agreed to produce such underlying documents, but a recent (August 1, 2007) disclosure that 3,166 pages of documents were "inadvertently" not produced raises concerns about whether all underlying documents have been produced.  Because Raytheon is not in a position to be able to determine that all documents have, in fact, been produced, Raytheon requests this Court compel production of any underlying document to the reports that has not been previously produced.  The reports and documents requested contain information critical to resolution of the key question in this case: was trichloroethylene ("TCE") used by the Government at Herington Army Air Field ("HAAF") during World War II?

## QUESTIONS PRESENTED

1.    Has the United States waived any privilege for the Task 8 report and Summary report because the United States failed to include these documents on its privilege log?

2.    Are the reports fact work product rather than opinion work product because they do not contain mental impressions or conclusions about litigation?

3.    Can Raytheon satisfy the "substantial need/undue hardship" test when the United States cannot recall the basis for its conclusion that there was no TCE use at HAAF and when Raytheon cannot obtain a substantial equivalent of the reports because they largely rely on the Government's unique knowledge of its historical operations?

4.    Can Raytheon establish extraordinary need for opinion work product when: 1) the reports may reveal, contrary to the Government's claims in this case, that the United States used TCE at HAAF, 2) the reports are the only information on the topic and are in the exclusive

---

[1] The items listed here correspond to items 1-5 in Raytheon's motion to compel and are listed in the same order as in the motion.

control of the United States, and 3) the mental impressions, if any, regarding TCE use at HAAF are at issue in this case?

## STATEMENT OF FACTS

In the mid-1990s, the Government contracted with TechLaw to provide research and information related to specific enumerated tasks that could be applied to numerous current and future projects and Potentially Responsible Party ("PRP") searches. TechLaw contract at ¶¶ 1.1, 2 (attached to this Memorandum at <u>Exhibit A</u>). The TechLaw contract listed nine tasks mostly related to the Government's historical use and disposal of cleaning solvents as well as oversight of facilities using such chemicals. *Id.* at ¶ 4. Task 4 and Task 8 are relevant to Raytheon's motion to compel. Task 4 was to research and provide documentation on the historical use and development of chlorinated solvents. Task 8 was to:

> Research and produce Army Airfield, Navy Airfield, and Early Air Force Base SOPs or manuals from the time of WWII up to the 1960's concerning the use of chemicals and industrial waste practices on these facilities. In the task report, list all key points relating to possible PRP liability of DOD.

*See* TechLaw contract at ¶ 4.8 (<u>Exhibit A</u>). The TechLaw contract also required the creation of a "summary report" to "outline the entire effort and list[] the different information to be found in each of the separate task reports." *Id.* at ¶ 5.1.

In 2000, Raytheon filed an action in this Court against the United States under the Freedom of Information Act ("FOIA"). Pursuant to FOIA, Raytheon requested production of the Task 4 report: "Historical Use and Development of Chlorinated Solvents," written in 1996, and "Solvents in Army Airfield Maintenance Operations – World War II" which was written by a USACE employee in 1998. The underlying supporting documents for the two reports were also

requested.[2]  On September 7, 2001, Judge Belot issued an order that the two reports could be withheld under the FOIA as work product, but that the underlying documents were not. *Raytheon Aircraft Co. v. United States Army Corps of Engineers*, 183 F. Supp.2d 1280, 1291 (D. Kan. 2001).  On December 18, 2001, the United States filed a "Notice of Compliance" in the FOIA case certifying that it provided all of the collections of supporting documents as ordered by Judge Belot.  See Notice of Compliance (Dec. 18, 2001) (attached to this Memorandum at Exhibit B).  The United States, however, recently admitted in a letter, dated August 1, 2007, that it "inadvertently" failed to produce 3,166 pages of documents from the FOIA litigation.  *See* Ltr. from Mary Whittle, Trial Attorney for the Department of Justice, to Beverlee Roper, counsel for Raytheon at ¶ 3 (Aug. 1, 2007) (attached to this Memorandum at Exhibit C).  In the August 1 letter, the United States offers no explanation as to why these documents were not previously produced.  Those documents were received by Raytheon on August 6, 2007 and Raytheon has not yet been able to determine whether all of the documents ordered to be produced in the FOIA litigation have actually been produced.[3]

Raytheon filed this action in 2005 in an attempt to recover its response costs from the Government for the clean up of HAAF.  The United States denies any liability for clean up costs based on the assertion that there was no TCE used at HAAF during World War II when the Government occupied the site.

USACE counsel, Catherine Sanders, made this denial to the EPA when she submitted responses to EPA's 104(e) requests on behalf of USACE.[4]  EPA requested that USACE identify

---

[2] The original FOIA request to the United States was broad enough to capture the Task 8 report and the Summary report, but the United States failed to disclose either in response to the request.
[3] Raytheon seeks to compel production of any underlying document that has not been previously produced.
[4] The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") provides EPA with authority to issue an interrogatory-like information request (often referred to as a "104(e) request") to "potentially responsible parties" ("PRPs").  *See* 42 U.S.C. § 9604(e).

the nature and terms of operations and processes, as well as any hazardous substances/hazardous wastes used or generated by the U.S. Army Air Force at HAAF. In response to the October 31, 1997 104(e), request regarding HAAF, Ms. Sanders stated that "[t]here is no evidence to indicate that the operations of [HAAF] included the use of hazardous substances/hazardous wastes." *See* Ltr. from Catherine R. Sanders, Assistant District Counsel, Kansas City District Corps of Engineers, to Mr. David A. Hoefer, Office of Regional Counsel, U.S. EPA Region VII (Dec. 22, 1997) at 3 (attached to this Memorandum as Exhibit D). According to the United States' 30(b)(6) witness on this topic, Ms. Sanders prepared and submitted the response without any technical assistance, after a limited investigation that consisted, at most, of a review of the Kansas City District's project files. *See* Kost Dep. (Nov. 8, 2006), at 32:23–33:04, 33:17–33:21 (attached to this Memorandum as Exhibit E). Ms. Sanders was also instrumental in preparing USACE's response to EPA's subsequent 104(e) request dated July 30, 2004. *See* Ltr. from Kevin W. Bond, District Counsel, Kansas City District Corps of Engineers, to Scott Pemberton, Environmental Protection Agency (July 30, 2004) at Enclosure C p. 1 (attached to this Memorandum as Exhibit F) (enclosing USACE's 104(e) response, which lists Ms. Sanders as an author of the response). USACE's response stated that "[b]ased upon a review of information collected to date, TCE or other material containing TCE, was not shipped to, stored, employed, handled, disposed of, or otherwise used at HAAF during 1943–1945." *See id.* at Enclosure C p. 2.

Discovery suggests that the responses to these 104(e) requests may have been unresearched and incomplete, at best. The United States produced Mr. Ed Kost as a Federal Rule of Civil Procedure 30(b)(6) witness to discuss the preparation of the 1997 104(e) response, but he consistently deferred to Ms. Sanders as "the best person to ask about the responses." Kost

Dep. (Nov. 8, 2006) at 96:16–97:01 (Exhibit E).   Ms. Sanders had no recollection of what information she possessed or what investigations USACE conducted to prepare the 104(e) responses.  Sanders Dep. 20:24-25, 21:1-4 (attached to this Memorandum as Exhibit G).  In fact, when asked a string of eight questions concerning USACE's investigations about Army Air Corps TCE use at HAAF, which she referred to in a September 9, 1996 letter to the Kansas Department of Health and Environment, written before she wrote USACE's 1997 104(e) response, she consecutively responded, "I have no specific recollection."  *Id.* at 45:11-25, 46:1-25, 47:1-25, 48:1-25, 49:1-11.

The Government did not identify the Task 8 report or the Summary report in any privilege log despite the fact that they fell within the scope of interrogatories numbered 3 and 4 and document requests numbered 11, 12, 13, 14, 15, 16, 17, 18, 64, 68, 88, 90, 91, and 92.  *See* Raytheon's First Interrogatories and First Requests for Production to Defendant United States (attached to this memorandum at Exhibit H**).**  The Task 8 report apparently does exist and is relevant, at least in the opinion of Stan Bauer, because he reviewed the documents supporting the report for Task 8, if not the report itself, when he prepared for his 30(b)(6) deposition.  Bauer testified: "I think I reviewed Report 8, which is operating procedures on Army Airfields." (Bauer Dep. 221:1-12) (attached to this Memorandum as Exhibit I).  Mr. Bauer then said he reviewed the documentation that supported Report 8.  *Id.*  The Government produced a listing of all documents collected for the final report for Task 4.  *See* ZZ0000011 to ZZ0000033 (attached to this Memorandum at Exhibit J).  The Government has not produced a similar listing for the document collection for Task 8.

Raytheon filed a Motion to Compel a Proper Rule 30(b)(6) Witness, Doc. 153, but that motion has not been ruled upon and Raytheon is unsure who, other than Ms. Sanders, would be

able to testify about the basis for Ms. Sanders' 104(e) response.  The reports requested in

Raytheon's motion describe the historical use of solvents by the Government, one specifically

reports on the use at WWII Army Airfields like HAAF.  These reports were likely part of the

basis of Ms. Sanders' denial of TCE use at HAAF in the 1997 and 2004 104(e) response and are,

therefore, critical to resolution of the issues in this case.  *See* Sanders Dep. 57:4-58:6 (agreeing

that the 1996 report was the basis of the 1997 104(e) response).

## ARGUMENT

I.    **The Task 8 report and Summary report must be produced because USACE's failure to include them on any privilege log waives the right to withhold the reports pursuant to privilege.**

The Federal Rules of Civil Procedure require that a detailed privilege log be produced if

documents are withheld from discovery on grounds of attorney-client privilege or work product.

FED. R. CIV. P. 26(b)(5); *In re Universal Service Fund Telephone Billing Practices Litigation*,

232 F.R.D. 669, 671 (D. Kan. 2005).  This Court established a list of nine pieces of information

that are to be included for each entry in the privilege log.  *In re USF*, 232 F.R.D. at 673.  If a

party fails to produce a privilege log or produces a deficient log, a court may deem the privilege

waived, regardless of which privilege was claimed.  *Id.* at 671 (citing *Employer's Reinsurance

Corp. v. Clarendon Nat'l Ins. Co.*, 213 F.R.D. 422, 428 (D. Kan. 2003) (citing *Haid v. Wal-Mart,

Inc.*, No. 99- 4186, 2001 WL 964102, at *2 (D. Kan. June 25, 2001) (holding claims of privilege

were waived by failing to timely produce a privilege log)); *Starlight Int'l, Inc. v. Herlihy*,

No. 97-2329, 1998 WL 329268, at *3 (D. Kan. June 16, 1998) (same)).

In the *Haid* case, the district court affirmed the magistrate's finding that the defendant

had waived its attorney-client privilege as to counsels' litigation files because it failed to provide

a privilege log identifying these documents which were responsive to plaintiff's document

request.  *Haid*, 2001 WL 964102 at *1.  The magistrate ordered the defendant in that case to

produce the litigation files. *Id.* The district court affirmed because it found defendants excuse for failing to provide an adequate privilege log—that the documents were clearly privileged—was unacceptable. *Id.* at *2. The court also denied defendant's request to produce a privilege log after-the-fact. *Id.* The *Starlight* case had substantially similar facts with the same outcome. *Starlight*, 1998 WL 329268 at *3.

In this case, USACE failed to identify the Task 8 report or the Summary report on any privilege log. This is similar to the situations in *Haid* and *Starlight* where the defendants failed to produce a privilege log. USACE has not demonstrated that its failure was due to an oversight or is simply a technical infraction. The Task 8 report and Summary report were responsive to interrogatories numbered 3 and 4 and document requests numbered 11, 12, 13, 14, 15, 16, 17, 18, 64, 68, 88, 90, 91, and 92. *See* <u>Exhibit H</u>. Existence of these reports and underlying documents was also withheld by the United States in the 2000 FOIA request by Raytheon.

The law is clear that the Court should deem that USACE has waived any right to claim privilege with regards to the Task 8 report and Summary report because USACE failed to include the reports on any privilege log. Raytheon directed a number of discovery requests to cover these reports. In addition, USACE inexplicably failed to disclose the Task 8 report and Summary report in the FOIA litigation. Waiver is appropriate in this case given USACE's actions regarding these reports. The Court should order production of these reports. *See Haid*, 2001 WL 964102; *Starlight*, 1998 WL 329268.

**II.    All of the reports contain fact work product rather than opinion work product because they do not contain mental impressions or conclusions about litigation.**

Even if the Court finds that USACE has not waived its right to claim that the Task 8 report and Summary report are protected work product, Raytheon can demonstrate substantial need for their production. Raytheon does not dispute Judge Belot's finding that the Historical

Use report or the WWII Airfield Solvents report that were the subject of the FOIA litigation are work product. Rather, Raytheon argues that all of the reports requested in its motion are fact work product that are discoverable upon a showing of substantial need and undue hardship.

Federal Rule of Civil Procedure 26(b)(3) draws a distinction between fact work product and opinion work product. *See Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 704 n.12 (10th Cir. 1998). Fact work product consists of documents prepared in anticipation of litigation that contain factual information. *Williams v. Sprint/United Management Co.*, 2007 WL 634873, *3 (D. Kan., Feb. 27, 2007) (citing *Frontier Refining*, 136 F.3d at 704 n.12). Opinion work product consists of documents prepared in anticipation of litigation that contain the mental impressions, conclusions, opinions, or legal theories of attorneys concerning the litigation. *Id.*; FED. R. CIV. P. 26(b)(3); *see also Simmons Foods v. Willis*, 196 F.R.D. 610, 612 n.6 (D. Kan. 2000) (explaining that a document is fact work product if "there is nothing on the face of these documents to indicate the information contained therein represents the mental impressions, conclusions, opinions, or legal theories of an attorney").

The Historical Use report and the WWII Airfield Solvents report that were the subject of the FOIA litigation were prepared to be used by the Formerly Used Defense Sites (FUDS) program to determine whether the Department of Defense had any liability at numerous sites under CERCLA and, if so, to determine the Government's fair share of contribution to the response costs. *Raytheon Aircraft Co. v. United States Army Corps of Engineers*, 183 F. Supp.2d 1280, 1284 (D. Kan. 2001) (citing declaration of A. Wright); Decl. of A. Wright at ¶¶ 5, 7 (attached to this Memorandum as <u>Exhibit K</u>). The reports were intended to provide thorough and consistent information on recurring topics at numerous sites that had "historical similarities." *Raytheon*, 183 F. Supp.2d at 1285.

The 1996 "Historical Use" report contains information about the Government's use of chlorinated solvents since the early 1900s.  *Id.* at 1286; Decl. of A. Wright ¶ 10.  The report was prepared by a contractor for USACE who reviewed and collected information from public records repositories, including the National Archives and Records Administration, the Library of Congress, the Air Force Museum, and the Defense Technical Information Center.  *Raytheon*, 183 F. Supp.2d at 1286 (citing Decl. of A. Wright ¶ 11).  This report corresponds to Task 4 in the TechLaw contract.  See TechLaw contract at ¶ 4.4 (<u>Exhibit A</u>).

The 1998 "Army Airfield Maintenance Operations-WWII" report was prepared because many of the FUDS sites under contamination investigation by the EPA were former WWII military bases.  *Id.*; Decl. of A. Wright ¶ 12.  That report was prepared by a USACE employee who reviewed and collected information from public records repositories, including the National Archives and Records Administration, the Library of Congress, the Air Force Museum, the National Air and Space Museum, the Defense Technical Information Center, and the USACE Office of History.  Decl. of A. Wright ¶ 13.

Because the Task 8 and Summary reports were never included on a privilege log or identified in the FOIA case, it is very difficult to know what they contain.  However, there is no reason to think that the Task 8 report was prepared for reasons different from the other two reports.  In fact, Ms. Wright's declaration indicates that the two reports requested in the FOIA litigation were two of many reports requested by the HTRW CX[5] counsel to be used to assess the Government's PRP liability.  *See* Decl. of A. Wright at ¶¶ 5-8.  The Task 8 report would have been one of the other reports described by Ms. Wright.  Furthermore, the description of Task 8 in the TechLaw contract indicates that the report summarizes the Standard Operating Procedures and technical manuals concerning the use and disposal of chemicals such as TCE.  *See* TechLaw

---

[5]     HTRW CX is an acronym for: Hazardous, Toxic and Radioactive Waste Center for Expertise.

contract at ¶ 4.8 (Exhibit A).  The TechLaw contract describes the Summary report as precisely that: a summary of the information contained in the reports created.  *Id.* at ¶ 5.1.

It is clear from the descriptions of the reports in Ms. Wright's Declaration, Judge Belot's opinion, and the TechLaw contract that the reports do not contain assessments of the Government's liability, but merely facts that may be relevant to such an assessment.  Ms. Wright described the reports as narrative reports "that summarize[] and analyze[] the collection of relevant records for information that is germane to liability and cost allocation under CERCLA." Decl. of A. Wright ¶ 5.  Judge Belot stated that the reports "are in a narrative form that includes an indexed and sorted collection of records supporting the analysis."  *Raytheon*, 183 F. Supp.2d at 1285.  Because the reports do not appear to contain the mental impressions or conclusions related to the Government's liability, the reports must be considered fact work product rather than opinion work product.[6]  *Williams*, 2007 WL 634873 at *3 (citing *Frontier Refining*, 136 F.3d at 704 n.12); *Simmons Foods*, 196 F.R.D. at 612 n.6.

Because the reports are fact work product, the substantial need/undue hardship test applies.  As discussed below, Raytheon has substantial need for the reports and cannot obtain equivalent data.

## III.    Raytheon satisfies the "substantial need/undue hardship" test.

### A.    Raytheon has a substantial need for the reports because the reports are the basis for USACE's denial of TCE use at HAAF and because USACE's only witness with knowledge on the topic cannot remember how she reached her conclusion that TCE was never used at HAAF.

Fact work product may be obtained by an opposing party upon a showing of substantial need of the materials and undue hardship to obtain the substantial equivalent.  FED. R. CIV. P.

---

[6]    To the extent that the reports do contain mental impressions or other opinion work product, those portions of the reports could be redacted such that only fact work product was produced.  However, Raytheon argues below that extraordinary circumstances exist to compel production of opinion work product.

26(b)(3); *Simmons Foods,* 196 F.R.D. at 612.

The substantial need prong of the test is met by showing that the information contained in the documents is no longer available from witnesses due to lack of memory, unavailability, or document destruction.  For example, in *EEOC v. General Motors, Corp.*, 1988 WL 170448 (D. Kan. Aug. 23, 1988), this Court determined the plaintiff had established a substantial need for the information for two reasons: 1) four of the eight witnesses identified in the documents were unable to answer questions about the complaint due to a lack of memory; and 2) three of the eight witnesses indicated that relevant documents had been lost or destroyed.  *Id.* at *3. Similarly, in *American Casualty Co. of Reading, Pennsylvania v. Healthcare Indemnity, Inc.*, 2001 WL 1718275 (D. Kan. May 21, 2001), the Court stated that substantial need was shown when "witnesses are no longer available or are unable to recollect the information sought."  *Id.* at *7.

Substantial need can also be shown when the information requested is extremely important to the resolution of the case because it is directly at issue.  In *Simmons Foods*, this Court found substantial need was met because the documents contained support for the affirmative defense of comparative negligence.  *Simmons Foods*, 196 F.R.D. at 612.  Other courts have held that substantial need is shown when the work product requested is critical to an issue in the case.  *See Frazier v. Southeastern Pennsylvania Tranp. Auth.*, 161 F.R.D. 309, 318 (E.D. Pa. 1995) (holding that fact work product could be discovered when it related directly to the "gravamen" of the case).

Similar to *Simmons Foods*, the reports contain information that supports (or refutes) Raytheon's claim that the Government is liable for some of the clean up costs at HAAF, clearly the gravamen of the case.  *See id.*  Despite numerous depositions and thousands of documents

exchanged, the United States cannot recall the basis for its denial of TCE use at HAAF in the 104(e) responses in 1997 and 2004. The United States has also repeatedly refused to produce a witness who can testify on this issue.

The United States produced Mr. Ed Kost as a 30(b)(6) witness to discuss the preparation of the 1997 104(e) response, but he consistently deferred to Ms. Catherine Sanders as "the best person to ask about the responses." *See* Kost Dep. (Nov. 8, 2006) at 96:16–97:01 (Exhibit E). *See also id.* at 32:23–33:4 (stating that Ms. Sanders and, to Mr. Kost's knowledge, no one else was involved in the preparation of USACE's 1997 104(e) response); *id.* at 120:05–120:12 (answering "I don't know the answer to that question" in response to a question regarding USACE's 1997 104(e) responses, but noting that Ms. Sanders would know the answer); *id.* at 149:11–149:18 (noting that "Ms. Sanders wrote most of the answers" for USACE's 2004 responses); *id.* at 216:13–216:17 (answering "I do not recall" in response to a question regarding the receipt of a document, and stating that Ms. Sanders may be the person to talk to regarding the answer). Not only did Mr. Kost lack first-hand knowledge of the noticed 30(b)(6) topic, but he relied on the 104(e) responses prepared by Ms. Sanders in preparing for his deposition testimony. *See id.* at 17:10–17:23.

Other depositions indicated that Ms. Sanders was the only individual who could testify regarding the preparation and accuracy of USACE's responses. USACE's Stan Bauer denied any significant involvement in the preparation of USACE's 104(e) responses. *See, e.g.*, Bauer Dep. (July 24, 2006) at 21:10–21:17 (Exhibit I) (stating he was "somewhat" involved in responding to FOIA requests, but that the 104(e) responses were "primarily . . . handled by the attorneys and possibly the Kansas City district"); *id.* at 228:18–228:23 (stating that he did not have any involvement in the preparation of the 104(e) response except for maybe providing

certain documentation, "but otherwise, I didn't prepare it at all"). Significantly, Mr. Bauer relied on the 104(e) responses prepared by Ms. Sanders in preparing for his deposition testimony. *See id.* at 228:10–228:14 (stating that he "flipped through some of the documents that were attached to Kansas City's 104(e) report" in preparation for his deposition). USACE's Joseph Novak based his deposition answers solely on the 104(e) responses and documents submitted to EPA along with the responses. *See, e.g.*, Novak Dep. (June 20, 2006) at 9:12–9:19 (attached to this Memorandum as <u>Exhibit L</u>) (stating that he had reviewed only USACE's 104(e) responses to prepare for his deposition).

But when Raytheon was finally able to depose Ms. Sanders after the Court overruled the United State's motion to quash her deposition, she was not competently prepared to fully and responsibly address the questions posed on the topics designated. First, she did not know what information she possessed and what investigations the USACE performed prior to preparing its 104(e) responses to the EPA. For example, she testified that she did not recall what she did to prepare the responses to the 1997 104(e) interrogatories, Sanders Dep. 20:24-25, 21:1-4; what information was available to USACE in 1997 when she prepared the responses, Sanders Dep. 15:13-16; or what investigations USACE performed before preparing the 104(e) responses, Sanders Dep. 34:7-19. Moreover, she failed to respond to questions concerning USACE's investigation of TCE usage at HAAF, which she referred to in a September 9, 1996 letter to the Kansas Department of Health and Environment, attached at <u>Exhibit M</u>, before drafting the 1997 104(e) response:

> Q: In your letter you wrote that "research indicates that the DoD did not use TCE during operations at the site from 1942 to 1947;" what research are you referring to?[7]
>
> A: "I have no specific recollection of that."

---

[7]    The questions presented here are paraphrased for ease of the Court.

Q:   You wrote that "historical information indicates…;" what historical information are you referring to?

A:  "I have no specific recollection at this point."

Q:  You wrote that "there is no evidence to suggest…;" what evidence did you review?

A:  "I have no specific recollection."

Q:   You wrote that "…solvents such as TCE were in short supply;" what information did you rely on to make that statement?

A:  "I have no specific recollection."

Q:  You wrote about the right to use solvents like TCE; where did you get that information?

A:  "I have no specific recollection."

Q:  You wrote about activities not justifying the use of TCE; what is the factual basis for that statement?

A:  "I have no specific recollection."

Q:  Any research or investigations regarding the HAAF as of September 9, 1996?

A:  "I have no specific recollection of what that research would be."

Q:   You wrote that the "CE research indicates that the DoD did not use TCE during operations at the site from 1942 to 1947;" what research said this?

A:  "I have no specific recollection of that research."

Sanders Dep. 45:11-25, 46:1-25, 47:1-25, 48:1-25, 49:1-11 (Exhibit G).

Ms. Sanders' conclusions in 1997 and 2004 that the Government did not use TCE at HAAF during WWII were based on the reports requested by Raytheon.  In her deposition, Ms. Sanders testified about a letter from USACE Project Manager, Carol Ann Charette, to the Kansas Department of Health and Environment.  Sanders Dep., 54:3-59:15 (Exhibit G). Ms. Charette's letter denies any TCE use at HAAF based on "considerable research into the operational histories of [HAAF and similar Army Air Fields]."  See Ltr. From Carol Ann

Charette, Project Manager, Kansas City District Corps of Engineers, to Lloyd E. Dunlap, Kansas Department of Health and Environment (May 7, 1997) at 1 (attached to this Memorandum as Exhibit N).  Ms. Sanders agreed that the research referred to in the letter includes the reports requested by Raytheon in its Motion.  Sanders Dep. 57:4-58:2.  Ms. Sanders also agreed that Ms. Charette's letter states that those reports were the basis of her conclusion in the 104(e) response.[8]  Letter of C. Charette at 3-6 (Exhibit N).  Ms. Sanders repeatedly stated that she had no recollection of what reports she reviewed in preparation for the 1997 or the 2004 104(e) responses and, therefore, cannot deny that the reports at issue here were the basis for her conclusions in those reports.  *See* Sanders Dep. at 58:19-21; 45:11-25, 46:1-25, 47:1-25, 48:1-25, 49:1-11; 82:24-83:4 (Exhibit G).  Ms. Sanders did recall, however, that the Historical Use and WWII Airfield Solvents reports requested in the FOIA litigation are the **only** historical documents she was aware of concerning the Government's historical activities (as it relates to TCE) at former Army airfields.[9]  *Id.* at 131:19-25.

Because the reports requested appear to be the only documents to discuss the Government's historical use of TCE and because those reports form the basis for USACE's denial of TCE use at HAAF, they are obviously critical to the outcome of this case that attempts to determine the Government's liability for contamination by TCE usage and disposal by the Government during WWII at HAAF.  Following the reasoning in *EEOC*, *Simmons Foods* and *Frazier*, above, the critical nature of the information contained in the reports satisfies the substantial need prong.  Furthermore, because Catherine Sanders has no recollection of how she

---

[8]    Although Ms. Sanders' testimony appears to conclude that both of the reports requested in the FOIA litigation were the basis for the 104(e) responses, Raytheon acknowledges that the 1998 report could not be the basis for the 1997 104(e) response.

[9]    The Task 8 report and Summary report appear to discuss the historical use of TCE at Army Airfields (based on the Task 8 description), but it is unclear whether Ms. Sanders was aware of these reports.

reached the conclusion that there was no TCE use at HAAF, the reports appear to be the only available source of information on this topic from the United States.

**B.    Raytheon cannot obtain the substantial equivalent of the reports because the Government has unique knowledge about its historical operations**

As noted in Judge Belot's opinion, the two reports requested in the FOIA litigation synthesized facts drawn from numerous documents culled from public depositories around the country.   The Task 8 report was likely also generated from numerous sources.   Raytheon is unable to obtain the substantial equivalent of the reports without hardship.   First, the reports and the supporting documents pertain to Government activities and operations that occurred over sixty years ago and the reports were generated almost a decade ago.   Supporting documents may no longer exist and the United States failed to provide all of the underlying documents in the FOIA litigation as recently revealed in a letter stating that 3,166 pages of documents were "inadvertently not produced."   *See* Ltr. from Mary Whittle, Trial Attorney for the Department of Justice, to Beverlee Roper, counsel for Raytheon at ¶ 3 (Aug. 1, 2007) (Exhibit C).   In fact, in her deposition, Ms. Sanders was unable to verify that all of the supporting documents for the 104(e) responses were ever properly gathered into a single location.   Sanders Dep. 115:19-123:10 (Exhibit G).   Thus, it is impossible to know where the documents are located today. Second, the Government and its contractor have more knowledge about the Government's historical operations than a third party such as Raytheon.   The Government is in a unique position to know what historically occurred at its WWII facilities.   *See Rutgard v. Haynes* 185 F.R.D. 596, 600 (S.D. Cal. 1999) (citing *Pappas v. Holloway*, 787 P.2d 30 (Wash. banc. 1990)) ("The clearest case for ordering production [of work product] is when crucial information is in the exclusive control of the opposing party."); *Frazier*, 161 F.R.D. at 319 (quoting *In re Sunrise Securities Litigation*, 130 F.R.D. 560, 568-69 (E.D. Pa. 1989)) (holding that even opinion work

product may be discovered if the work product contains information that "'is within the exclusive control of the party from whom the discovery is sought.'"). Raytheon's analysis of the underlying documents would not recreate a substantial equivalent of the reports because the report relies on information that is in the exclusive control of the Government. Furthermore, in light of the United State's recent disclosure of the existence of 3,166 that were not produced in the FOIA litigation, it is unclear whether Raytheon even has all of the underlying documents.

Having established that Raytheon has a substantial need for the reports and that Raytheon cannot obtain the substantial equivalent of the reports, this Court should grant Raytheon's motion to compel.

**IV.    Even if the reports were deemed to be opinion work product, USACE's lack of cooperation with Raytheon to determine the basis for the denial of TCE use at HAAF is sufficient to overcome the privilege.**

Neither the Tenth Circuit nor this Court has ruled upon the question of whether there is a different standard for overcoming opinion work product privilege. *See Frontier Refining*, 136 F.3d at 704 n.12; *Simmons Foods*, 196 F.R.D. at 612-13 ("there is no universally accepted standard regarding the level of protection accorded to opinion work product").[10] Both Courts, however, addressed this issue in *dicta*.

In *Simmons Foods*, this Court echoed the Tenth Circuit's opinion work product analysis from *Frontier*, recognizing that other Circuits have applied either a compelling need test or an extraordinary justification test to overcome opinion work product as opposed to the "substantial need" test. *Simmons Foods*, 196 F.R.D. at 613. In *Frontier*, the Tenth Circuit implied that at least one of these tests would apply. *Frontier Refining Inc.*, 136 F.3d at 704 n. 12 ("if the less rigorous standard for other work product was not met, neither of *the possible opinion work*

---

[10]    This Court reiterated this sentiment in *Williams*, 2007 WL 634873, at *3.

*product standards* could be met")[11]; *see also* 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 26.70[5][e] (Matthew Bender 3d ed. 2007) ("The majority of federal courts, however, have followed the better rule that 'opinion work product' is subject to disclosure on a showing of 'extraordinary circumstances.'").

The case of *EEOC v. Anchor Continental, Inc.*, 74 F.R.D. 523 (D.S.C. 1977), is an example of the extraordinary justification that would compel production of opinion work product.  In that case, the defendant employer was charged with racial discrimination in employment and moved to compel production of documents supporting the discrimination claim, some of which constituted opinion work product.  *Id.* at 525.  The court granted that motion after an *in camera* inspection of the documents revealed that "Plaintiff has a weak case and is running a gigantic bluff."  *Id.*  The court went on to say that "Defendant has called the bluff and done a service to itself and to others who may find themselves defendants with the Federal government as an adversary."  The court found that although opinion work product is generally exempt from discovery, "there must be an exception to this rule when the Court's *in camera* inspection reveals that the plaintiff, a branch of United States government, has little faith in its case, has little evidence to go on and hopes to be able to prove the case through discovery or force a settlement upon a defendant who might not be able to stand the financial burden of defending itself."  *Id.* at 526-27.  Thus, the court granted the motion to compel the opinion work product stating that to do otherwise "would not be in keeping with the Court's responsibility to seek justice in every case."  *Id.* at 529.

The compelling need test arises in cases where the mental impressions of attorneys are at issue in the case.  *See Ferrara & DiMercuriou, Inc. v. St. Paul Mercury Ins. Co.*, 173 F.R.D. 7,

---

[11]    Similarly, since the implication is that the privilege could be overcome, it is not absolute.  *Frontier Refining Inc.*, 136 F.3d at 704 n.12.

17 (D. Mass. 1997) (collecting cases so holding).  There is also a compelling need when the information "'is within the exclusive control of the party from whom the discovery is sought." *Frazier*, 161 F.R.D. at 319 (quoting *In re Sunrise Securities Litigation*, 130 F.R.D. 560, 568-69 (E.D. Pa. 1989)).

In this case, similar to *Anchor Continental*, an *in camera* inspection may reveal that the Government knows that TCE was used at HAAF during WWII.  In that case, the Court should compel production of the document to avoid the injustice of litigating a case that the Government knows it cannot win.  On the other hand, the reports may support USACE's denial of TCE use at HAAF.  In that case, the United States would need to reconcile its reports with the substantial evidence gathered in this case that shows TCE was used at HAAF during WWII.  Following *Frazier*, since that information is in the exclusive control of the Government and no other sources of the information can be had, their production should be compelled.  Finally, to the extent that the reports contain the mental impressions of USACE attorneys or their representatives, those impressions are at issue in this case because they reflect the basis for USACE's denial of TCE use at HAAF.  *See Ferrara & DiMercuriou,* 173 F.R.D. at 17 ("[O]pinion work product is subject to discovery where the mental impressions of counsel are directly at issue.").  Thus Raytheon can satisfy both the compelling need test and the extraordinary justification test sufficient to overcome the protection of opinion work product.

## **CONCLUSION**

This case turns on whether the Government used TCE at HAAF during WWII.  USACE denies that any TCE was used during WWII, but discovery has revealed that the denial is unresearched and dubious, at best.  USACE refuses to provide a witness that can testify as to the research or investigation that forms the basis for the denial of TCE use.  The United States has waived its right to claim the Task 8 report and Summary report are protected work product

because it failed to include these reports on any privilege log in this case despite the fact that they were responsive to many of Raytheon's discovery requests.  Furthermore, all of the reports at issue are clearly fact work product that were intended to support the Government's assessment of its liability at sites like HAAF.  The United States admits that the reports at issue are the only reports of the Government's historical use of TCE and that the reports were the likely basis for the denial of TCE use at HAAF.  Raytheon has substantial need for the reports because they are directly relevant to the ultimate issue in this case and are the only source of the necessary information.  Raytheon cannot obtain the substantial equivalent of these reports because the Government has unique knowledge of its historical operations.  Even if the reports were considered opinion work product, there is compelling need for their production because they may reveal the Government has been less than forthright, the reports are in the exclusive control of the Government, and the mental impressions related to TCE use are at issue in this case.  In the alternative, should the Court find that any opinion work should not be produced, Raytheon requests that the reports be produced with the opinion work product redacted.  Raytheon also requests the production of any underlying documents to the reports that have not previously been produced.  For these reasons, this Court should grant Raytheon's motion to compel.

Respectfully submitted,

/s/ Stephen J. Torline
Beverlee J. Roper          KS #77969
Stephen J. Torline         KS #18292
Laura K. Brooks            KS #22060
Blackwell Sanders LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080

Attorneys for Plaintiff Raytheon Aircraft
Company

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2007, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Natalia Sorgente, Esq.
Scott J. Jordan
Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986

/s/ Stephen J. Torline
Attorney