## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Raytheon Aircraft Company,**

        **Plaintiff,**

v.                                                                      **Case No. 05-2328-JWL**

**United States of America,**

        **Defendant.**

### <u>MEMORANDUM AND ORDER</u>

This is an environmental case filed under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., concerning trichloroethylene (TCE) contamination at the Tri-County Public Airport Site in Herington, Kansas. Plaintiff Raytheon Aircraft Company alleges claims against the United States (based on the Army Corps of Engineers status as an alleged co-PRP at the Site) for cost recovery under section 107(a) of CERCLA and for contribution under sections 107(a) and 113(f) of CERCLA. The United States alleges counterclaims against Raytheon for cost recovery under sections 107(a)(2) and 107(a)(4)(A) of CERCLA (based on costs incurred by the Environmental Protection Agency) and for contribution under section 113(f) of CERCLA.

This matter is presently before the court on the United States' motion for summary judgment (doc. 289). In its motion, the United States seeks summary judgment on Raytheon's claims for cost recovery and contribution on the grounds that Raytheon cannot meet its burden of proving that the United States used TCE at the Site. In the alternative, the United States moves for summary judgment on two legal issues concerning Raytheon's claims for cost

recovery and contribution: (1) whether a liable party such as Raytheon can seek joint and several liability with respect to its cost recovery claim; and (2) whether Raytheon can recover as necessary response costs litigation-related expenses and costs related to its PRP search.[1]  In addition, the United States seeks summary judgment on its counterclaim for cost recovery on the grounds that Raytheon's predecessor contaminated the Site and the United States incurred response costs as part of its oversight of the cleanup at the Site.  As will be explained, the court denies the United States' motion in its entirety.

*Raytheon's Evidence that the United States Used TCE at the Site*

In its motion for summary judgment, the United States contends that Raytheon cannot meet its burden of proving that the United States used TCE at the Site and, thus, cannot make its prima facie case for cost recovery or contribution under CERCLA.  In response, Raytheon has submitted for the court's review volumes of what it deems to be both direct and circumstantial evidence that the United States used TCE at Herington.  The United States, in turn, challenges much of this evidence as incompetent under Federal Rule of Civil Procedure 56 and Local Rule 56.1(d) or inadmissible under the Federal Rules of Evidence.  After carefully reviewing the parties' submissions, and bearing in mind that the evidence must be viewed in the

---

[1]In its motion, the United States also sought summary judgment on the legal issue of whether the court, in calculating any judgment in favor of Raytheon, must consider amounts that Raytheon has already received through insurance payments or through government contracts.  The court has previously ruled on this issue in connection with other motions filed by the parties and, as a result, the United States, in its reply brief, has expressly withdrawn that portion of its motion.

light most favorable to Raytheon as the party opposing summary judgment, *see Emerson v. Kansas City Southern Ry. Co.*, 503 F.3d 1126, 1128 (10th Cir. 2007), the court concludes that it is unnecessary at this juncture to address the vast majority of Raytheon's evidence and the United States' arguments concerning that evidence because a small portion of Raytheon's submission is sufficient to withstand the United States' motion regardless of whether the court, as the fact finder at trial, ultimately finds that evidence persuasive or finds the United States' evidence persuasive on the issue.[2]

Specifically, one of Raytheon's witnesses, Colonel Bickerstaff, testified to his first-hand knowledge that the Army used a vapor degreaser for spark plug degreasing at Herington. While Colonel Bickerstaff testified that he did not know what solvent was used in the degreaser, Joseph Novak, the United States' 30(b)(6) witness designated to speak to certain activities at Herington, testified that if the Army in fact used a vapor degreaser at Herington then that degreaser necessarily would have used TCE. These simple facts, taken together, are sufficient for a reasonable fact finder to conclude that the Army used TCE at the Site.[3] While the United States urges that one of Raytheon's own experts, Frank Salamone, testified that Colonel Bickerstaff

---

[2]To be clear, the court does not concern itself at this time with the weight or credit to assign to any particular evidence submitted by Raytheon or the United States. The court simply concludes, for summary judgment purposes, that Raytheon has come forward with evidence from which a rational fact finder could conclude that the Army used TCE at the Site.

[3]The United States' motion for summary judgment is directed only to whether Raytheon has sufficient evidence of the Army's use of TCE and the United States does not contend, at least on summary judgment, that Raytheon does not have sufficient evidence connecting any alleged use by the Army with the specific areas of contamination at the Site.

3

"did not understand fully what he was describing," Mr. Salamone's testimony (or the portion of his testimony that is in the record) is unclear as to whether he disagrees with Colonel Bickerstaff's testimony about the presence of a vapor degreaser or whether he simply disagrees with Colonel Bickerstaff's description of the way in which a vapor degreaser operates. In any event, even assuming that Mr. Salamone testified that he believed that what Colonel Bickerstaff was describing was not, in fact, a vapor degreaser (a characterization urged by the United States), a factual issue is nonetheless presented by this evidence. Similarly, while the United States attempts to discredit other aspects of Colonel Bickerstaff's memory in an effort to persuade the court that Colonel Bickerstaff's memory concerning the presence of a vapor degreaser is unworthy of belief, any evaluation of Colonel Bickerstaff's credibility must await trial. *See Burlington Northern & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1023 (10th Cir. 2007) ("[I]t is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment.").

For the foregoing reasons, the court denies the United States' motion for summary judgment on Raytheon's claims for cost recovery and contribution.

*Joint and Several Liability*

As an alternative to its argument that it is entitled to summary judgment on the merits of Raytheon's claims for cost recovery and contribution, the United States moves for summary judgment on a legal issue concerning the amount of response costs that Raytheon is entitled to recover on its cost recovery claim. Specifically, the United States seeks this court's ruling that

Raytheon, as a liable party, is not entitled to pursue its cost recovery claim on a theory of joint and several liability (such that Raytheon could shift the entirety of its response costs to the United States) but instead is entitled to recover from the United States only the United States' "fair share" of response costs.

Federal courts have consistently interpreted section 107(a) to impose joint and several liability on PRPs. *See United States v. Burlington Northern R. Co.*, 200 F.3d 679, 697 (10th Cir. 1999) (section 107(a) "has been consistently interpreted to impose joint and several liability"). The leading case on joint and several liability under CERCLA is *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802 (S.D. Ohio 1983). *Id.  Chem-Dyne* is explicitly recognized and endorsed in the legislative history to the Superfund Amendment and Reauthorization Act of 1986 ("SARA") regarding CERCLA's liability provisions.  *Id*. (citing legislative history).   In *Chem-Dyne*, the court noted that, although CERCLA does not expressly provide for joint and several liability for PRPs, Congress intended the scope of liability to be determined in accordance with "traditional and evolving principles of common law." *Id*. (quoting *Chem-Dyne*, 572 F. Supp. at 808).  Accordingly, the court stated that when "two or more persons acting independently caused a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused." *Chem-Dyne*, 810 F. Supp. at 810.  But "where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm." *Id.* at 810 (citing Restatement (Second) of Torts § 875).  Where the conduct of two or more persons liable under section 107(a) has combined to violate the statute and one or more of the defendants

5

seeks to limit his liability on the ground that the entire harm is capable of apportionment, the burden of proof as to apportionment is upon each defendant. *Id.* According to the *Chem-Dyne* court, "[t]hese rules . . . are most likely to advance the legislative policies and objectives of the Act"–to provide "rapid responses" to threats posed by hazardous waste sites and "to induce voluntary responses to those sites." *Id*. at 810, 805.

In *Chem-Dyne*, the plaintiff asserting the section 107(a) claim was the United States in its role as the enforcer of CERCLA and, indeed, until very recently, the majority of the courts that had addressed the issue, including the Tenth Circuit, had held that a section 107(a) claim for cost recovery was available only to the United States as the enforcer of CERCLA and to innocent parties and that PRPs could not pursue a section 107(a) claim against other PRPs for joint and several liability. *See Cooper Indus., Inc. v. Aviall Servs., Inc*., 543 U.S. 157, 169 (2004) (citing numerous decisions of the Courts of Appeals holding that a private party that is itself a PRP may not pursue a section 107(a) claim against other PRPs for joint and several liability). In *Atlantic Research*, however, the Supreme Court held that the plain language of section 107(a) authorizes cost recovery claims by any private party, including PRPs. *See United States v. Atlantic Research Corp*., 127 S. Ct. 2331, 2336 (2007). The question presented by the United States' motion for summary judgment, then, is whether the *Chem-Dyne* approach applies to a section 107(a) claim when the party asserting that claim is itself a liable party.

The United States, before this court, urges that the *Chem-Dyne* rationale makes sense only when the United States as the enforcer of CERCLA or innocent parties are asserting section 107(a) claims because *Chem-Dyne* focuses on, in the words of the United States, "the

6

"importance of joint and several liability to the government's ability to achieve expeditious cleanup."[4]  According to the United States, such considerations have "no place" in a dispute among or between liable parties.  The court disagrees.  The policy considerations relied upon by the *Chem-Dyne* court in favor of its finding that section 107(a) imposes joint and several liability–rapid responses to threats posed by hazardous waste sites and the encouragement of voluntary responses to those sites–are very much in play regardless of whether the party asserting  a cost recovery claim is the United States, an innocent party or a PRP.  By providing a PRP with an opportunity to pursue joint and several liability against other PRPs, section 107(a) further encourages a PRP to quickly and voluntarily cleanup a site in the hopes that it might recover its response costs from other PRPs who, perhaps like the Army in this case, made the decision to sit by and let other PRPs bear the initial burden of cleanup despite its own status as a potentially responsible party.  In such circumstances, if the plaintiff-PRP meets its burden of proving that the defendant-PRP is a liable party, then the court discerns no unfairness in shifting the burden of proof to the defendant-PRP to show that the harm is divisible and the degree to which the plaintiff-PRP is responsible.  If the defendant-PRP is unable to carry its burden, then it will be liable for the entire harm and the plaintiff-PRP will be entitled to 100% cost recovery–a right it would have earned by stepping up to the plate and cleaning up the site.

The court's conclusion finds support in the Supreme Court's *Atlantic Research* decision.

---

[4]As noted below in the text, the United States has apparently argued to the opposite effect in a case before the Southern District of New York.  *See In re Dana Corp*., 2007 WL 4205823 (S.D.N.Y. Nov. 20, 2007).

In *Atlantic Research*, the United States argued to the Court that permitting PRPs to pursue cost recovery claims under section 107(a) would allow PRPs to "eschew equitable apportionment under §113(f) in favor of joint and several liability under § 107(a)." *Atlantic Research*, 127 S. Ct. at 2337. In addressing that argument, the Supreme Court assumed without deciding that section 107(a) provides for joint and several liability and rejected the United States' concern:

> [A] defendant PRP in such a §107(a) suit could blunt any inequitable distribution of costs by filing a §113(f) counterclaim. 459 F.3d, at 835; see also *Consolidated Edison*, *supra*, at 100 n.9 (collecting cases). Resolution of a §113(f) counter-claim would necessitate the equitable appointment of costs among liable parties, including the PRP that filed the §107(a) action. 42 U.S.C. § 9613(f)(a) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determine are appropriate.").

*Id.* at 2338-39.

In support of its assertion that the filing of a section 113(f) counterclaim would blunt any inequitable distribution of costs, the Supreme Court referenced the Eighth Circuit's *Atlantic Research* decision. *See Atlantic Research Corp. v. United States*, 459 F.3d 827 (2006). The Eighth Circuit–in a decision that the Supreme Court ultimately affirmed–rejected "an approach which categorically deprives a liable party of a § 107 remedy" (a remedy that potentially includes 100% cost recovery) and held that PRPs may, under appropriate procedural circumstances, bring a cost recovery action under section 107. 459 F.3d at 835. In so holding, the Eighth Circuit touched on the issue of a PRP's ability to pursue joint and several liability:

> We recognize that § 107 allows for 100% cost recovery. Some pre-*Aviall* cases justified denying liable parties access to §107, reasoning Congress would not have intended them to recover 100% of their costs and effectively escape liability. *See, e.g., United Techns.*, 33 F.3d at 100 ("it is sensible to assume that Congress intended only innocent parties–not parties who were themselves

> liable–to be permitted to recoup the whole of their expenditures."). We agree, and reaffirm . . . that a liable party may not use § 107 to recover its full response cost.
>
> But § 107 is not limited to parties seeking to recover 100% of their costs. To the contrary, the text of §107(a)(4)(B) permits recovery of "any other necessary costs of response . . . consistent with the national contingency plan." While these words may "suggest full recovery," *United Techns.*, 33 F.3d at 100, they do not compel it. CERCLA, itself, checks overreaching liable parties: If a plaintiff attempted to use § 107 to recover more than its fair share of reimbursement, a defendant would be free to counterclaim for contribution under §113(f).

*Id*. (footnote and additional citations omitted). The court reads the Eighth Circuit's decision as recognizing that a plaintiff-PRP is not automatically entitled to achieve a net recovery of all of its costs simply because joint and several liability is available under a section 107(a) claim. If the defendant-PRP shows that the plaintiff-PRP is overreaching and attempting to recover costs for which it is responsible, then the counterclaim for contribution will permit a reckoning. To be sure, the defendant-PRP bears the burden of proof under this approach, but it is an appropriate burden to effectuate the policy considerations which encourage a party, whether it be innocent or not, to clean up and know that it will have recourse for reimbursement.

The other case cited by the Supreme Court in *Atlantic Research*, *Consolidated Edison*, also addressed (albeit briefly by way of a footnote) the issue of a plaintiff-PRP's ability to pursue joint and several liability under section 107(a). In that case, the Second Circuit recognized a PRP's right to bring a cost recovery claim under section 107(a) and noted that the fear that a plaintiff-PRP would be unjustly enriched if allowed to recover 100 percent of its costs from other PRPs was "misplaced":

> While we express no opinion as to the efficacy of such a procedure, there appears

9

> to be no bar precluding a person sued under section 107(a) from bringing a counterclaim under section 113(f)(1) for offsetting contribution against the plaintiff volunteer who, if sued, would be liable under section 107(a).

*Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc.*, 423 F.3d 90, 100 n.9 (2d Cir. 2005). The only post-*Atlantic Research* case that this court has uncovered that has addressed the issue of a plaintiff-PRP's ability to pursue a cost recovery claim for joint and several liability relied on *Consolidated Edison* to reject the defendant-PRP's argument that the plaintiff-PRP did not have standing to assert a claim for joint and several liability. *In re Dana Corp.*, 2007 WL 4205823, at *7-8 (S.D.N.Y. Nov. 20, 2007). In *In re Dana Corp.*, Dana Corporation (hereinafter the "Debtors") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. *Id.* at *1. Thereafter, the United States filed two proofs of claim largely stemming from response costs incurred by the EPA pursuant to 107(a) of CERCLA for response efforts at various Superfund sites. *Id.* at *1-2. The Debtors objected to the United States' proofs of claim on various grounds and the United States, in turn, objected to various motions filed by the Debtors and moved to withdraw the reference of the matter from the United States Bankruptcy Court for the Southern District of New York to the United States District Court for the Southern District of New York. *Id.* at *1-2.

The district court determined that withdrawal of the proceeding referred to the bankruptcy court was mandatory under 28 U.S.C. § 157(d) and, in so deciding, concluded that certain issues presented by the case required "substantial and material consideration" of CERCLA. *Id.* at *4-

8.[5]  One of those issues concerned the imposition of joint and several liability under section 107(a) and, more specifically, the Debtors' objection to the United States' proofs of claim on the grounds that the United States as the Department of Defense contributed to the environmental damage at issue such that the United States, as a potentially responsible party, should not have standing to assert a claim for joint and several liability.  *Id*. at *7.  According to Debtors, the United States' claim was "quintessentially one for contribution and one that effectively seeks to shift the Government's own liability to Dana."  *Id*.

The United States successfully argued to the district court that it was entitled to pursue a section 107(a) claim "for the entire cost of the remedial action" even if the court determined that the United States was itself liable for contamination at the site.  *Id.*  ("The Government asserts . . . that it can [sue Debtors under a theory of joint and several liability] but it's going to be a substantial and material question for this Court to decide.").  According to the United States, the appropriate  vehicle to address any liability on the part of the United States would be a section 113 counterclaim for any amounts for which the United States is allegedly responsible.  *Id*.  The United States has not explained to this court why, in another case, it should be able to pursue joint and several liability despite its potential status as a liable party and why the non-government PRP's section 113(f) counterclaim in that case was sufficient to blunt any inequitable distribution but, in this case, Raytheon should be precluded from doing so and the

---

[5]Section 157(d), as construed by the Second Circuit, requires withdrawal when substantial and material consideration of non-Bankruptcy code federal law is necessary for the resolution of the proceeding.  *Id.* at *3.

section 113(f) counterclaim procedure is "unfair" and inadequate.  Presumably, no reasonable explanation exists.  In any event, *In re Dana Corp*. further supports this court's conclusion that Raytheon is entitled to pursue joint and several liability against the United States as the district court ultimately disagreed with Debtors' "contention that because the Government might itself be potentially responsible for the harm . . . it should not have standing to assert a claim for joint and several liability under section 107." *Id*. at *8.  Looking to *Consolidated Edison*, the district court stated that Debtors' concerns regarding the United States' own liability "may be more properly addressed in a section 113(f) contribution action." *Id.*

For the foregoing reasons, the court denies the United States' motion concerning Raytheon's ability to pursue a theory of joint and several liability.

*Raytheon's "Litigation Expenses" and Other Costs*

The United States also asserts in its motion for summary judgment, relying on the Supreme Court's decision in *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994), that Raytheon "cannot seek recovery for litigation expenses not closely related to the cleanup" at Herington.  In *Key Tronic*, the Court held that although litigation-related attorney fees incurred in prosecuting a private response recovery action were not recoverable under CERCLA, attorney fees incurred in identifying other potentially responsible parties were recoverable as a necessary cost of response because such identification increases the probability of an effective cleanup, significantly benefits the entire cleanup effort, and serves a statutory purpose apart from the reallocation of costs.  511 U.S. at 819-20. Notably, *Key Tronic* did not change the rule in the

Tenth Circuit that "nonlitigation attorney fees" are recoverable if "they were necessary to the cleanup effort." *See Atlantic Richfield Co. v. American Airlines, Inc*., 98 F.3d 564, 571 (10th Cir. 1996) (citing *FMC Corp. v. Aero Indus*., 998 F.2d 842 (10th Cir. 1993)).

While the United States' opening brief purports to ask the court to deduct significant amounts from Raytheon's requested recovery on the grounds that Raytheon has "failed to show" that its fees or costs are recoverable under *Key Tronic*, the United States has not marshaled the evidence with respect to Raytheon's requested fees or costs in any manner from which the court could ascertain for purposes of granting summary judgment in favor of the United States whether the specific fees or costs requested by Raytheon are beyond the scope of allowable fees or costs contemplated by *Key Tronic*.  For this reason, summary judgment is not appropriate with respect to any particular category or amount of fees or costs sought by Raytheon.

In its reply brief, the United States–responding to Raytheon's complaint that it had not provided the court with sufficient evidence to enable the court to make the requisite factual determination of whether Raytheon's fees are recoverable–clarifies that it intends to present at trial expert testimony to "sift through" plaintiff's claim for costs, particularly its claim for litigation-related expenses and a PRP search that was conducted after the EPA identified the Army as a possible party of interest at the Site.   According to the United States, it is simply asking the court at this juncture to rule as a matter of law that Raytheon cannot recover costs for "drafting litigation documents, deposition activities, case strategy, legal research, preparation of trial notebooks, reviewing privilege logs, or petitioning EPA for reimbursement, among other litigation tasks" and to rule that Raytheon cannot recover costs for a PRP search that occurred

after EPA had identified the Army as a "party of interest."

The motion is denied. While the court obviously will not permit Raytheon to recover "litigation expenses" as mandated by Supreme Court and Tenth Circuit precedent, the court declines to apply that rule of law to the broad descriptions of costs identified by the United States without any factual context for those descriptions. Similarly, the court declines to render a sweeping statement about Raytheon's ability to recover costs related to its PRP search in the absence of evidence concerning the timing, nature and extent of that search. Indeed, in the primary case relied upon by the United States in support of its argument that Raytheon's PRP search costs are not recoverable, the court made findings pertinent to that issue only after an evidentiary hearing. *See Bancamerica Commercial Corp. v. Trinity Indus., Inc.*, 900 F. Supp. 1427, 1463-65 (D. Kan. 1995) (holding separate evidentiary hearing after trial to permit plaintiffs to present evidence of attorney fees related to identifying PRPs and ultimately holding that fees sought in connection with identifying other PRPs were not recoverable because the purported "search" began six months after plaintiff had brought suit against those parties), *reversed in part on other grounds*, 100 F.3d 792 (10th Cir. 1996). The only other case relied upon by the United States, *Plaskon Electronic Materials, Inc. v. Allied-Signal*, 904 F. Supp. 644 (N.D. Ohio 1995), denied the defendants' motion for summary judgment on the issue of the plaintiff's pre-litigation PRP search costs in light of factual issues. *See id.* at 666-67 (while fees incurred in pursuing litigation against PRPs are not recoverable under *Key Tronic*, pre-litigation identification costs are recoverable and the amount of such costs is an issue of fact to be proven at trial). At trial, then, the parties may present evidence concerning whether and to what extent

14

Raytheon's attorney fees constitute necessary costs of response consistent with *Key Tronic*.

*The United States' Counterclaim*

Finally, the United States moves for summary judgment on its counterclaim for cost recovery under section 107(a).  Because the United States bears the burden of proof on its claim, its initial summary judgment burden is not merely to point to the absence of a genuine issue of material fact.  Rather, the United States must show that "no disputed material fact" exists on its claim and, absent such a showing, Raytheon bears no summary judgment burden. *Cf. Johnson v. Riddle*, 443 F.3d 723, 724 n. 1 (10th Cir. 2006) (clarifying summary judgment burden where a defendant is seeking summary judgment on the basis of an affirmative defense).  To prevail on its motion, then, the United States, among other things, must show that no disputed material fact exists with respect to whether TCE was released into the environment during Beech's[6] operations at the Site.

In its motion, the United States asserts that it is undisputed that TCE was released into the environment during Beech's operations at the Site through leaks and spills of TCE from Beech's TCE degreasers and through Beech's general disposal of waste TCE at the Site.  In support of this assertion, the United States directs the court only to the deposition testimony of Richard Lewis, one of Raytheon's experts.  In the portion of Mr. Lewis's testimony submitted by the United States, however, Mr. Lewis did not testify that Beech was responsible for the TCE

---

[6]Beech is Raytheon's predecessor and it is undisputed that Raytheon assumed any environmental liabilities of Beech.

15

contamination at the Site.  Rather, he testified only that he would be "surprised" if TCE was not released at the Site during Beech's operations based on his experience at other sites.  Mr. Lewis's testimony, then, is not sufficient to show that "no disputed material fact" exists on this element of the United States' claim.  Moreover, the only remaining evidence discussed by the United States in its opening brief is the presence of TCE degreasers at the Site during Beech's operations and the location of those degreasers at the alleged source of contamination.  This circumstantial evidence, however, is analogous to Raytheon's evidence concerning the Army's use and disposal of TCE at the Site.  The United States, then, has not shown in its opening brief that no disputed material fact exists as to Beech's disposal of TCE at the Site.

In its reply brief, the United States addresses for the first time its Statement of Fact No. 54, which asserts that Raytheon "told its insurers that the disposal practices of the time included disposal of TCE on the ground and that Beech's disposal practices were consistent with standard disposal practices of other manufacturers operating during the same period."  The United States also states that "Raytheon admitted to its insurers that it had no written protocol for the disposal of TCE from its vapor degreasers."  For both of these assertions, the United States relies only on its Exhibit Z, a one-page document from Raytheon's "Response to Hancock Rothert & Bunshoft Coverage Issues."  While that document may be sufficient to create an inference that Raytheon disposed of TCE on the ground, it does not mandate that inference.  The document states that Raytheon's disposal practices were consistent with standard disposal practices at the time and notes that "the labels of some products containing TCE suggested that disposal on the ground was an appropriate practice."  Exhibit Z does not state that Raytheon actually disposed

of TCE on the ground, does not state that disposal on the ground was standard industry practice and does not reference in any respect the absence of a written protocol for TCE disposal.[7] While one of the United States' experts, John Robertson, testified that "one" industry standard was to dispose of TCE waste on the ground, Mr. Robertson admitted in another portion of his deposition that another industry standard was to send TCE waste to an appropriate recycler. Indeed, Raytheon has submitted evidence that it barreled and shipped its TCE waste to Wichita for recycling. While this evidence is vigorously contested by the United States, that dispute only serves to emphasize that the United States has not shown that no disputed material fact exists concerning the release of TCE at the Site during Beech's operations.

The United States also asserts in its motion that Beech disposed of paint strippers containing phenols in a disposal pond located to the north of Hangar 1 and that the phenols mixed with TCE in the groundwater, causing the TCE to degrade more rapidly and mobilize more quickly in the soil and groundwater of the Site. The United States, however, has not shown that no disputed material fact exists with respect to its assertions regarding the disposal of phenols. Although there is evidence in the record that phenols generally commingle with TCE and cause TCE to degrade, the evidence set forth by the United States does not link Beech's disposal of paint strippers in the north pond to TCE degradation at the Site. Rather, the United

---

[7]The parties devote a significant portions of their briefs to the issue of whether Raytheon's statements to its insurers (for example, its statement that its disposal practices were consistent with standard disposal practices) are inadmissible under Federal Rule of Evidence 408. The court need not resolve that issue at this juncture because the United States has not shown it is entitled to summary judgment even assuming the admissibility of Exhibit Z.

States relies on an intricate "chain of admissions" by Raytheon allegedly establishing that the contaminant plume to which EPA responded contained TCE degradation products produced by Beech's disposal of phenol-based solvents at the northwest corner of Hangar 1.[8]  The United States, however, has not supported each alleged admission with a citation to evidence in the record and the court will not do the work of the United States to support its motion for summary judgment on a claim for affirmative relief.  Simply put, the United States has not met its burden of showing it is entitled to summary judgment on its cost recovery claim based on Raytheon's disposal of phenols at the north disposal pond.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the United States' motion for summary judgment (doc. 289) is **denied.**

**IT IS SO ORDERED.**

Dated this 21st day of December, 2007, at Kansas City, Kansas.

---

[8]In its opening brief, the United States points to Raytheon's disposal of phenols in a "disposal pond" to the north of Hangar 1 but, in its reply brief, the United States focuses on Raytheon's disposal of phenols in the "northwest corner of Hangar 1."  Neither party adequately explains the distinction, if any, between these two descriptions and whether that distinction is significant.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge